**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-367 (RBW)** |
| **ROCKNE EARLES,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Rockne Earles, to 52 months' incarceration, 36 months' supervised release, $2,000 in restitution, and a special assessment of $200. 52 months' incarceration is the midpoint of Earles's calculated guidelines range.

## I.    INTRODUCTION

The defendant, Rockne Earles, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

In the days leading up to January 6, 2021, Earles, a retired Army Major, made plans to travel from his home in North Dakota to Washington, D.C., because, as he opined via text message, "sometimes things have gone far enough that it's time to spit on your hands raise the black flag and begin slitting throats." After attending the "Stop the Steal" rally at the Ellipse on January 6, Earles traveled to the Capitol's West Plaza, where he saw police officers struggling to hold back the mob at the entrance to the northwest stairs. Earles grabbed a full bottle of Gatorade from the ground and threw it at U.S. Capitol Police ("USCP") Officer B.W., who stood guard at the base of those stairs. The Gatorade bottle narrowly missed Officer B.W.'s head. Then, after the mob started to ascend the stairs, Earles approached USCP Officer A.C. from behind and tackled him to the ground—clearing a path for other rioters to advance closer to the Capitol. Earles eventually entered the Capitol building at 2:17 p.m., just minutes after the building's initial breach, and remained inside for approximately 27 minutes.

The government recommends that the Court sentence Earles to 52 months of incarceration for his two 18 U.S.C. § 111(a)(1) convictions. A 52-month sentence reflects the gravity of Earles's conduct and his continued lack of remorse, while also acknowledging his admission of guilt via his guilty plea.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 82, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Earles's Role in the January 6, 2021 Attack on the Capitol

#### *Earles's Preparation for the January 6, 2021 Riot*

In the weeks leading up to January 6, 2021, Earles discussed his plans to be in Washington, D.C., on January 6 with various groups. After considering his transportation options, Earles decided to travel from his home in North Dakota to Washington, D.C., with a small group of acquaintances.

Earles also made plans to meet two of his friends from the Army, who were traveling from Florida, in Washington, D.C. Beginning on December 24, 2020, Earles made plans to "rendezvous" with these friends, "J.W." and "C.M.", in a text message group chat. In this chat, J.W. discussed "locat[ing] a safe house" and warned that "[g]uns in Virginia OK guns in the district go to jail." Earles responded, "Roger." A few days later, on December 29, C.M. detailed the types of weapons the group could bring with them to Washington, D.C., explaining "You can carry a knife in DC as long as the knife is not a switchblade," "Stun Guns and Tasers are Legal," and "Mace is also allowed." Later, on December 31, when C.M. expressed his frustration with "fair weather Patriots," Earles responded, "Sunshine patriots get no love for me. . . . sometimes things have gone far enough that it's time to spit on your hands raise the black flag and begin slitting throats."

In an interview with the FBI, Earles described participating in one or more teleconferences about the upcoming events of January 6 prior to traveling to Washington, D.C. Earles reported that, during these teleconferences, he advised participants to bring water and first aid supplies with them on January 6, citing his personal experience in the military and concerns of violence from Antifa.

Earles then traveled from his home in North Dakota to Washington, D.C. to attend the

"Stop the Steal" rally and election-related events occurring in Washington, D.C. on January 6, 2021. ECF No. 82 at ¶ 8.

### *Earles's Assaults on the Capitol's West Front*

On January 6, 2021, Earles attended the "Stop the Steal" rally at the Ellipse, where he listened to President Trump's speech. Earles knew and understood from President Trump's remarks at the rally that Vice President Pence would be present at the Capitol that day for the certification of the Electoral College votes. *Id.* at ¶ 9.

After the rally ended, Earles walked to the U.S. Capitol, where a large crowd had gathered. Earles wore a black knit hat, chrome-colored goggles with a black strap, a black bandana with a white pattern around his neck, a black leather jacket with zippered breast pocket, black gloves, a green shirt, and blue jeans. *Id.* at ¶ 10. In an interview with the FBI, Earles indicated that he decided to put the goggles on after reaching the Capitol to protect his eyes from "pepper balls."

As the crowd grew violent at the base of the Northwest Scaffolding built for the Inaugural Stage, Earles stooped down to grab from the ground an approximately twenty-ounce bottle of Gatorade filled with blue liquid. He then threw the bottle at USCP Officer B.W., who was guarding access to the interior of the scaffolding and the steps leading up to the Capitol building. The bottle narrowly missed Officer B.W., hitting the tarp where his head had been moments before. *Id.* at ¶ 11; Gov. Sent. Ex. 1; Gov. Sent. Ex. 2.

4



*Image 1: Screenshot from Gov. Sent. Ex. 1 at 00:06, with Earles, Circled in Red, Throwing Full Gatorade Bottle at Officer B.W.*



*Image 2: Screenshot from Gov. Sent. Ex. 1 at 00:07, with Gatorade Bottle, Circled in Yellow, Hitting Tarp Where Officer B.W.'s Head Had Been Just Moments Before*

Shortly thereafter, the crowd pushed through and against U.S. Capitol Police Officers

attempting to hold back rioters at the Northwest Scaffolding. The crowd advanced up the Northwest Stairs but was briefly stopped at a doorway partway up the stairs. ECF No. 82 at ¶ 12.

Earles and a handful of other rioters then breached the police line that formed at the doorway by climbing through an open area of scaffolding to the north of the doorway. *Id.* at ¶ 13; Gov. Sent. Ex. 3. Once behind the police line, Earles reached out and grabbed USCP Officer A.C., who was attempting to prevent rioters from advancing through the doorway. Earles then pulled Officer A.C. from the doorway and tackled him to the ground. ECF No. 82 at ¶ 13; Gov. Sent. Ex. 4; Gov. Sent. Ex. 5.



*Image 3: Screenshot from Gov. Sent. Ex. 4 at 00:00, with Earles, Circled in Red, Grabbing Officer A.C. from Behind*



*Image 4: Screenshot from Gov. Sent. Ex. 5 at 00:13, with Earles, Circled in Red, Tackling Officer A.C. to the Ground*



*Image 5: Screenshot from Gov. Sent. Ex. 5 at 00:16, with Earles, Circled in Red, with his Hand on Officer A.C.'s Back as Officer A.C. Attempts to Stand Up*

By removing Officer A.C. from the doorway, Earles's assault cleared a path toward the Capitol, and other rioters immediately swarmed through the doorway and up the stairs. Gov. Sent. Ex. 5 at 00:13–25. Earles joined them, proceeding up the stairs at the Northwest Scaffolding toward the Capitol's Upper West Terrace. He was among the first rioters to make it past the police line protecting the entrance to the Upper West Terrace. ECF No. 82 at ¶ 14.

### Earles's Breach of the Capitol Building

At approximately 2:17 p.m., Earles entered the Capitol building's first floor through the Senate Wing Door—a mere four minutes after the first breach of the Capitol building, which took place at this entrance. *Id.* at ¶ 14; Gov. Sent. Ex. 6 at 00:55–01:10; 05:38–45. At the time of his entry, broken glass covered the floor, and a loud siren was blaring.

At approximately 2:24 p.m., C.M. entered the Capitol building through the Senate Wing Door. Earles greeted C.M., and the pair walked toward the Crypt. *See Id.* at 12:55–13:05. By approximately 2:29 p.m., Earles and C.M. walked to the Rotunda, where they paused to speak to another rioter carrying the Speaker of the House's lectern.[2] Gov. Sent. Ex. 7 at 00:45–00:52.

---

[2] The rioter in question was Adam Johnson, 21-cr-648 (RBW), who pled guilty to entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), and was sentenced by this Court to 75 days' incarceration, 1 year's supervised release, $500 in restitution, and a $5,000 fine.



*Image 6: Screenshot from Gov. Sent. Ex. 7 at 00:51, with Earles, Circled in Red, Interacting with Rioter Carrying the Speaker of the House's Lectern Through the Rotunda*

At approximately 2:32 p.m., Earles and C.M. walked through Statuary Hall before joining a group of rioters that had formed outside the main entrance to the House Chamber. *See* Gov. Sent. Ex. 8 at 00:22–25. At that time, a line of USCP officers blocked the path forward, but, at approximately 2:35 p.m., the rioters—including Earles—surged forward, pushing past the police officers. Gov. Sent. Ex. 8 at 03:50–04:30; Gov. Sent. Ex. 9 at 02:15–55. Rioters at the front of the mob advanced all the way to the House Chamber door, as the crowd chanted "STOP THE STEAL." *Id.*; Gov. Sent. Ex. 9 at 02:45–03:05.



*Image 7: Screenshot from Gov. Sent. Ex. 8 at 00:25, with Earles, Circled in Red, Joining the Mob Outside the House Chamber*



*Image 8: Screenshot from Gov. Sent. Ex. 7 at 04:25, Showing How Far Earles, Circled in Red, Advanced Toward the House Chamber Door as Part of the Mob's Surge Forward*

At approximately 2:39 p.m., Earles and C.M. turned around and walked back through Statuary Hall. Gov. Sent. Ex. 8 at 07:10–25. They then walked downstairs and through the Hall of Columns before exiting the Capitol building through the South Door at approximately 2:44 p.m. In total, Earles spent approximately 27 minutes inside the Capitol building. ECF No. 82 at ¶ 17.

### Earles's Post-Plea Interview with the FBI

On December 10, 2024, Earles participated in an interview with law enforcement, pursuant to the terms of his plea agreement. Earles reported that he chose to travel to Washington, D.C., based on a desire to support President Trump and, in his view, the democratic process. He stated that he wanted to support President Trump and Vice President Pence in sending the results of the election "back to the states," and he regrets that Congressional efforts to challenge the certification of the election results were stopped due to the events of January 6.

As discussed above, Earles described participating in one or more teleconferences, in which he advised others planning to travel to Washington, D.C., to bring water and first aid supplies with them on January 6, citing concerns about violence from groups like Antifa and/or Black Lives Matter. Earles explained that this advice was based, at least in part, on his training and experience in the military. Later in the interview, when asked whether his military training and experience helped him recognize law enforcement efforts to control the scene at the Capitol, Earles equivocated, saying he was "rusty."

Once in Washington, D.C, Earles explained that one of his travel companions gave him a radio to use if the group was separated. They did become separated later: Earles acknowledged that the majority of his travel companions chose not to enter the Capitol building and instead walked to Union Station to get coffee. However, Earles continued toward the Capitol, where he described seeing people covered in blood and suffering from the effects of tear gas and pepper

spray on the West Plaza. In fact, he noted that he decided to put on a pair of goggles to protect his eyes from "pepper balls." Earles also reported seeing officers "scrapping" with members of the mob at the Capitol.

When asked about his interaction with Officer B.W., Earles stated that he threw the full Gatorade bottle "on impulse" and that he thought it would be "symbolic" and send a message of "hey, listen to us." Earles claimed that, at the time he threw the Gatorade bottle, he did not think it would hit or injure any police officers. Earles cited a former shoulder replacement, saying that he was not capable of throwing the bottle with much force. Both of these statements are hard to square with video footage of the incident, Gov. Sent. Ex. 1, which shows Earles throwing the bottle with considerable force directly at the nearest police officer.

With respect to Officer A.C., Earles acknowledged his acts satisfied the elements of his crime of conviction but maintained that he acted out of concern for Officer A.C., saying that he "chose to put [his] hands on an officer to prevent him from getting his ass kicked." Specifically, Earles claimed that he recalled Officer A.C. being assaulted by a man with a flagpole and decided to step in to help Officer A.C. The video evidence contradicts this claim.

At best, Earles was indifferent to an assault on Officer A.C. by another rioter. Gov. Sent. Ex. 5 at 00:02–04 depicts Earles standing directly behind a man in a red jacket as that man jabs a flagpole toward Officer A.C. Earles took no action with respect to the man with the flagpole and, instead, stepped past that individual, went underneath the scaffolding, and approached Officer A.C. from behind. *Id.* at 00:04–10. Then, as Officer A.C. attempted to block rioters from advancing through a doorway, Earles tackled Officer A.C. from behind and pulled him to the ground— leaving a clear path for other rioters to breach the doorway Officer A.C. was attempting to guard. *Id.* at 00:10–15. As rioters surged forward and Officer A.C. attempted to get back on his feet,

Earles then placed his hand on Officer A.C.'s back, preventing him from getting up. *Id.* at 00:15–18.

Earles stated that he ultimately chose to follow the mob into the Capitol "like a lemming." Once inside, he recalled seeing a rioter hanging from a chandelier and he acknowledged seeing a rioter carrying a lectern. Earles described seeing and hearing a large group of people "yelling and hollering" near the entrance to the House Chamber—although he was not sure at the time if the doors led to the House or Senate Chamber. Earles reported that, at that point, he decided that he needed to leave the Capitol building. He never mentioned, however, that he joined this group as it surged forward and pushed a line of police officers back against the House Chamber door.

Broadly speaking, Earles stated that he regretted his actions on January 6, saying that "it was not our intention for that to happen." He also specifically reported regretting his decision to throw the Gatorade bottle at Officer B.W. Any statement of remorse with respect to Officer A.C. was more equivocal. Earles maintained that he acted out of concern for Officer A.C., even if those actions may have ultimately constituted a violation of 18 U.S.C. § 111(a). When pressed on whether he actually regretted those actions, Earles held up his shackled hands and said yes.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 20, 2024, a federal grand jury returned a superseding indictment charging Earles with nine counts, including, 18 U.S.C §§ 231(a)(3) (Civil Disorder); 231(a)(3) (Civil Disorder); 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers); 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon); 1752(a)(1) and (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon), 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); and 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) and 40 U.S.C. §§ 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building); 5104(e)(2)(F) (Act of Physical Violence in the Capitol Building or Grounds); and 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). On, September 20, 2024, Earles was convicted of Counts Two and Three of the superseding indictment, based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Earles now faces sentencing on Counts Two and Three of the superseding indictment, charging him, in both counts, with Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).[3]

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years of imprisonment, a term of supervised release of not more

---

[3] Count Three of the superseding indictment charges Earles with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b). For that count, however, Earles has pled guilty to the lesser included offense of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1).

than three years, a fine of not more than $250,000, restitution, and a mandatory special assessment of $200.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR accurately sets forth the Sentencing Guidelines calculations for both counts of conviction in this case:

Count Two: 18 U.S.C. § 111(a)(1):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| Victim-Related Adjustment (U.S.S.G. § 3A1.2) | +6 |
| | 20 |

Count Three: 18 U.S.C. § 111(a)(1):

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)) | 14 |
| Specific Offense Characteristic (U.S.S.G. § 2A2.2(b)(2)(B) | +4 |
| Victim-Related Adjustment (U.S.S.G. § 3A1.2) | +6 |
| | 24 |

| | |
|---|---|
| Combined Offense Level: | 26 |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |

| | |
|---|---|
| Total Adjusted Offense Level: | 23 |

*See* PSR at ¶¶ 50–72.

Per the terms of the plea agreement in this case, the government reserved the right to seek U.S.S.G. § 2A2.2(b)(2)(B)'s four-level enhancement for the use of a "dangerous weapon" with respect to Count Three. ECF No. 81 at ¶ 5(A). For purposes of this enhancement, the term "dangerous weapon" means "an instrument capable of inflicting death or serious injury," U.S.S.G. § 1B1.1, Application Note 1(D), and includes "any instrument that is not ordinarily used as a weapon . . . if such an instrument is involved in the offense with the intent to commit bodily injury."

U.S.S.G. § 2A2.2, Application Note 1. "Bodily injury" is defined as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought," and "serious bodily injury" can include any "injury involving extreme physical pain." U.S.S.G. § 1B1.1, Application Notes 1(B), 1(M).

Earles threw a full, approximately 20-ounce bottle of Gatorade in the direction of Officer B.W.'s head. Although Officer B.W. ultimately ducked out of the way and narrowly avoided the bottle, the force with which it was thrown is clear from the visible impact the bottle makes with the tarp just behind Officer B.W. Gov. Sent. Ex. 1 at 00:05. Based on the FBI's investigation, a typical 20-ounce bottle of Gatorade weighs approximately 1.4251 pounds—more than four times the weight of a standard baseball.[4] Courts have routinely found that items similar in size and/or weight to such a Gatorade bottle satisfy U.S.S.G. § 2A2.2's definition of a dangerous weapon when used to carry out an assault in a manner capable of inflicting serious injury. *See, e.g., United States v. Tolbert*, 668 F.3d 798 (6th Cir. 2012) (affirming application of Section 2A2.2(b)(2)(B)'s four-level enhancement where defendant struck victim in the head with a plastic water pitcher); *United States v. Dunnaway*, 88 F.3d 617, 619 (8th Cir. 1996) (affirming application of Section 2A2.2(b)(2)(B)'s four-level enhancement where defendants used "a bottle" and "their boots" as dangerous weapons during an assault).

The evidence in this case shows that Earles threw the full Gatorade bottle with substantial force in the direction of Officer B.W.'s head. This act is wholly consistent with "the intent to commit bodily injury" against Officer B.W. and contradicts Earles's assertion that he did not think

---

[4] *See*, "Baseballs Buying Guide," DICK'S SPORTING GOODS (last visited Jan. 2, 2025), https://www.dickssportinggoods.com/rc/baseballs-buying-guide?srsltid=AfmBOopfuxQ1mN2nDQlEdoKNGOGvV2-adLp1PJKoWIuyOEQYORzrfQ3u ("Baseballs used in competitive play for all leagues youth through adult . . . must fall between 5 to 5.25 ounces.")

the bottle would hit any law enforcement officer. Moreover, had Officer B.W. not ducked out of the way, the bottle's impact with his face easily could have caused extreme physical pain. This application of 2A2.2(b)(2)(B) is neither novel nor surprising. No rational person would accept a full bottle of liquid being rocketed into their face in the middle of a riot, with good reason: it could cause serious bodily injury, including extreme pain.

Accordingly, the U.S. Probation Office correctly concluded that U.S.S.G. § 2A2.2(b)(2)(B)'s four-level enhancement for the use of a "dangerous weapon" is appropriate in this case. PSR at ¶ 60.

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The parties agree, per the plea agreement, that Section 4C1.1 does not apply in this case because Earles used violence or credible threats of violence in connection with the offenses of conviction. *See*. U.S.S.G. § 4C1.1(a)(3).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 75. Accordingly, based on the total adjusted offense level calculated by both the government and the U.S. Probation Office, after acceptance of responsibility, at 23, Earles's Guidelines imprisonment range is 46 to 57 months' imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Earles's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

17

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. As this Court has observed in another January 6 case, this is a "very, very serious offense . . . [that] goes to the heart of what America is supposed to be." *United States v. Arthur & Jessica Reyher*, 23-cr-138 (RBW), Tr. 02/27/24 at 57.

Before ever arriving in Washington, D.C., Earles prepared for violence and, once he arrived at the Capitol, he repeatedly used physical force against police officers. These assaults contributed significantly to the mob's larger efforts: only after Earles tackled Officer A.C. to the ground was the rest of the mob was able to advance further up the northwest stairs and, eventually, breach the Capitol building. *See* Gov. Sent. Ex. 5 at 00:13–25. Even after his assaults of Officers B.W. and A.C., Earles continued to position himself toward the front of the mob, entering the building mere minutes after its initial violent breach at the Senate Wing Door, Gov. Sent. Ex. 6 at 05:38–45, and later surging forward with the mob outside the House Chamber, Gov. Sent. Ex. 8 at 03:50–04:30.

The nature and circumstances of Earles's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 52 months' incarceration.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Earles describes being raised in a stable, middle-class home, with both parents and several siblings. PSR at ¶ 81–83. Although his parents and one sibling have passed away, he reports maintaining good, supportive relationships with his remaining siblings. *Id.* at 84.

Earles holds a bachelor's degree in biology and chemistry, *id.* at ¶¶ 114–115, and, although now retired, he previously served in the U.S. Army, reaching the rank of Major and reporting deployments to Europe, Turkey, and Iraq. *Id.* at ¶¶ 118, 121. We commend his service. But as a military officer, Earles took an oath to support and defend the Constitution—an oath he betrayed

on January 6, 2021. As a military officer, he received training, not only at taxpayers' expense, but with the trust of the American people. He misused this training and trust when he used it to prepare and execute violence on January 6, 2021.

Earles has been married to his current wife since 2001, and he has five children, ranging in age from six years old to 29 years old. *Id.* at ¶¶ 85–87. Earles has reported that the family's financial situation would not be materially affected if this Court sentences Earles to a custodial sentence. *Id*. at ¶ 88.

Earles reports that he suffers from post-traumatic stress disorder ("PTSD") as a result of his military service. *Id.* at ¶¶ 102, 105. He describes his symptoms as including "hypervigilance, startle reflex, and difficulty sleeping," as well as a general irritability. *Id.* at ¶¶ 105, 106. Earles's PTSD symptoms do not mitigate his violent acts on January 6. Neither Officer B.W. nor Officer A.C. startled Earles, or even approached him in any way. Rather, Earles threw an item at Officer B.W. from a distance and, later, approached Officer A.C. from behind before tackling him to the ground. Moreover, if Earles felt hypervigilant on January 6, he should have noticed all of the obvious signs—from the police presence to tear gas in the air—that he was not permitted to be on the Capitol grounds, let alone violently breaking past police lines.

In short, Earles's history and characteristics do not mitigate his criminal behavior on January 6.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Earles's criminal conduct on January 6 was the epitome of disrespect for the law. As courts in this district have warned in other January 6-related cases, "[w]e cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Earles engaged in repeated violence against police officers on January 6 and directly facilitated the mob's advance up the northwest stairs and toward the Capitol building. Moreover, Earles's post-January 6 statements, minimizing his conduct or offering alternate explanations inconsistent with the evidence, suggest a lack of

---

[5]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

remorse.

Although Earles accepted responsibility by stipulating to the facts underlying his crimes and resolving his case via a plea agreement (after the parties had begun preparing for trial), his statements in the December 10, 2024 interview raise some concerns. Perhaps most significantly, Earles appears not to meaningfully appreciate the true nature of his conduct. As detailed above, while Earles should earn technical acceptance of responsibility, he has also envisioned an interaction with Officer A.C. that did not actually occur.

Moreover, Earles's statements of "remorse" have focused largely on regretting the *consequences* of his actions, rather than the actions themselves. For example, Earles told the FBI that he regretted that the events of January 6 negatively impacted efforts to challenge the certification of the presidential election results. Put another way, rather than regretting the harm he and other rioters caused to police officers and lawmakers, Earles regrets that he did not achieve his political goals. The Court should therefore view any remorse Earles expresses at sentencing with skepticism. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United*

*States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden).

22

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[7]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Caldwell*, 21-cr-181 (CKK), Caldwell sprayed bear spray at a line of police officers on the Capitol's West Plaza. Like Earles, Caldwell was a military veteran who came to the Capitol prepared for violence and wore glasses to protect his eyes from the effects of chemical irritants. And, like Earles, Caldwell accepted responsibility via a plea agreement. Notably, unlike Earles, Caldwell was charged with, and pled guilty to, one assault. Moreover, Earles's attack on Officer A.C. was egregious, and its impact—paving the way for other rioters to advance closer to the Capitol—aggravated an already volatile situation. Judge Kollar-Kotelly ultimately sentenced Caldwell to 68 months' incarceration, near the midpoint of Caldwell's guidelines range of 63 to 78 months. Given the similarities between *Caldwell* and the present case, the government's recommended sentence of 52 months, at the midpoint of Earles's guidelines range, would not create an unwarranted sentencing disparity.

In *United States v. Hazard*, 22-cr-117 (RDM), the defendant tackled a police officer to the ground on the northwest stairs—shortly before Earles tackled Officer A.C. Like Earles, Hazard and his associates messaged each other prior to January 6 to prepare for violence in Washington, D.C. And like Earles, Hazard accepted responsibility via a plea agreement, although he was charged with and pled guilty to only one assault. Following his assault, Hazard returned to the West Plaza. and entered the building at 2:56 p.m. and remained inside for a few minutes. In contrast, Earles positioned himself at the front of the mob as it breached the Capitol at 2:13 p.m.;

To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

and Earles followed quickly at 2:17 p.m. and stayed for 27 minutes. Unlike Earles, the victim of Hazard's assault suffered permanent injury as a result of Hazard's actions. Judge Moss sentenced Hazard to 57 months' incarceration. On balance, given that Earles committed two separate assaults but also considering that Earles did not directly cause permanent injury through his acts, this case demonstrates that the government's recommended sentence would not create an unwarranted sentencing disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officers A.C. and B.W., did not suffer bodily injury as a direct result of Earles's assaults. The parties

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Earles must pay $2,000 in restitution, which reflects in part the role Earles played in the riot on January 6.[9] ECF No. 81 at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Earles's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR at ¶ 165.

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000 each for Counts Two and Three. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

---

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 52 months' incarceration, 36 months' supervised release, $2,000 in restitution, and a special assessment of $200.

Respectfully submitted,

BRIDGET M. FITZPATRICK
ACTING UNITED STATES ATTORNEY
DC Bar No. 474946

BY:    /s/ *Sean J. Brennan*
SEAN J. BRENNAN
Assistant United States Attorney
NY Bar No. 5954128
601 D Street NW
Washington, DC 20530
Sean.Brennan@usdoj.gov
202-252-7125

/s/ *Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759